IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Olivia S.,[1] | ) | C/A No.: 1:20-2054-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated June 19, 2020, referring this matter for disposition. [ECF No. 9]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On August 26, 2016, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on April 1, 2016. Tr. at 77, 79, 189–90, 191–97. Her applications were denied initially and upon reconsideration. Tr. at 122–26, 131–36. On December 6, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward Morriss. Tr. at 34–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 4, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 1, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 40 years old at the time of the hearing. Tr. at 38. She completed high school and one year of college. *Id.* Her past relevant work ("PRW") was as a cook and dishwasher, a driver, an armored services technician, a trade technology specialist, a school bus driver, and a coach operator. Tr. at 245. She alleges she has been unable to work since December 5, 2016.[2] Tr. at 38.

2.    Medical History

Plaintiff presented to Robert J. Teachman, D.O. ("Dr. Teachman"), for a one-year history of moderate right shoulder pain on March 17, 2015. Tr. at 341. Dr. Teachman noted normal findings on exam, aside from a body mass index ("BMI") of 36.36. Tr. at 344. He assessed shoulder pain and vitamin D deficiency. *Id.* He prescribed a vitamin D supplement, referred Plaintiff to physical therapy ("PT") for her shoulder, indicated she likely had osteoarthritis in her knees and hands, and instructed her to return in a month. Tr. at 345.

Plaintiff presented to James Island PT for an initial evaluation for right shoulder pain on March 24, 2015. Tr. at 329. She reported her right shoulder "locked up" and indicated she experienced increased pain upon

---

[2] During the hearing, Plaintiff moved to amend her alleged onset date to coincide with the date that she last worked. Tr. at 38.

3

raising her right arm in front of her. *Id.* Plaintiff demonstrated active range of motion ("ROM") of the right shoulder within functional limits with some pain, except for on internal rotation. *Id.* Her strength was 4+/5 on manual muscle testing and the Hawkins test was positive for pain. *Id.* Physical Therapist Brandon Craig Duffie ("PT Duffie"), noted Plaintiff had shoulder pain with possible impingement that was characterized by increased pain and decreased strength and function. *Id.* He recommended a course of PT and indicated Plaintiff had good rehabilitation potential. *Id.* Plaintiff followed up for PT sessions on April 4, 8, 15, and 21. Tr. at 330–33.

On April 15, 2015, Dr. Teachman noted Plaintiff's shoulder pain was improving and referred her for additional PT for knee pain. Tr. at 349.

PT Duffie conducted a second evaluation for right knee pain on April 21, 2015. Tr. at 334. Plaintiff complained that her pain increased with walking. *Id.* PT Duffie noted active ROM within functional limits, 4+/5 strength, genu recurvatum, thickened plica, and decreased iliotibial band and hamstring flexibility. *Id.* He stated Plaintiff had knee pain with possible plica irritation characterized by increased pain and decreased strength, flexibility, and function. *Id.* He felt that Plaintiff would benefit from focused PT and had good rehabilitation potential. *Id.* Plaintiff followed up for PT sessions on April 28 and May 4. Tr. at 335–36.

4

Plaintiff complained of fatigue, rash, and muscle aches and sought to be screened for lupus on August 25, 2015. Tr. at 522. Dr. Teachman recorded normal findings on exam. Tr. at 523. He referred Plaintiff to a rheumatologist and instructed her to follow up in two months. *Id.*

Plaintiff presented to Erica Anderson, D.O. ("Dr. Anderson"), for an initial rheumatology assessment on January 8, 2016. Tr. at 382. She complained of widespread joint pain, myalgias, and fatigue and requested testing for lupus, as her aunt had the disease. *Id.* She endorsed intermittent swelling in her hands and knees, achiness in her left hip and bilateral shoulders, bruising on her legs, scattered rashes on her abdomen, mild shortness of breath, reflux, abdominal discomfort, and feeling fatigued, despite resting well at night. *Id.* Dr. Anderson recorded normal exam findings, aside from cervical paraspinous tenderness and positive trigger points in the trapezius and rhomboid. Tr. at 383–84. She assessed myalgia, joint pain, and fatigue and noted long-term nonsteroidal anti-inflammatory drug ("NSAID") use. Tr. at 384. She ordered multiple lab studies and refilled Plaintiff's prescriptions for Mobic 15 mg and Omeprazole 40 mg. *Id.*

Plaintiff reported elevated blood pressure, dizziness, and headache on January 11, 2016. Tr. at 415. Dr. Teachman noted normal findings on exam, aside from elevated blood pressure at 138/84 mmHg. Tr. at 416. He

instructed Plaintiff to track her home blood pressure readings and to follow up in two weeks. *Id.*

On February 24, 2016, Plaintiff reported widespread joint pain, myalgias, and fatigue. Tr. at 379. Dr. Anderson assured Plaintiff that her lab results were normal and that she did not have lupus. *Id.* She noted normal findings on exam, aside from paraspinous tenderness in the cervical and lumbar spines and positive trigger points in the trapezius and rhomboid. Tr. at 380. She stopped Mobic and ordered chest x-rays and a sleep study. Tr. at 381.

Plaintiff presented to Roper St. Francis Sleep Center for a complete polysomnogram ("PSG") on April 26, 2016. Tr. at 356–60. She demonstrated sleep efficiency of 74.2% and a total of 82 limb movements. Tr. at 356. She had no apneas and 84 hypopneas. *Id.*

Plaintiff complained of fibromyalgia, fatigue, and abdominal pain on May 5, 2016. Tr. at 412. Dr. Teachman recorded normal findings on exam. Tr. at 413. He assessed right shoulder pain, anxiety state, elevated blood pressure, epigastric pain, vitamin D deficiency, and chronic fatigue and ordered lab studies. *Id.*

Plaintiff followed up with internal medicine and pulmonary disease specialist J. Austin Ball, M.D. ("Dr. Ball"), on May 25, 2016, to discuss results of the PSG. Tr. at 364. She endorsed trouble sleeping, sleepiness throughout

the day, fatigue, nasal congestion, dizziness, weakness, and chronic productive cough. *Id.* She said she felt tired when she woke and exhausted throughout the day. *Id.* She described having driven home from work and not having known how she got home and having awakened in neighborhoods without having known where she had gone. *Id.* She indicated she was too tired to use the gym in her home. *Id.* She reported a family history of lupus and feared she had the impairment. *Id.* Dr. Ball noted Plaintiff's sleep study revealed significant obstructive sleep apnea ("OSA") with an apnea hypopnea index of 14.7 per hour and periodic limb movement disorder ("PLMD"), as well. Tr. at 366. He recorded normal findings on physical exam. Tr. at 366–68. He assessed OSA, PLMD, unspecified hypersomnia, and other obesity due to excess calories. Tr. at 368. He prescribed Gabapentin 300 mg and instructed Plaintiff to take it one hour prior to bedtime. *Id.* He indicated Plaintiff was to obtain a continuous positive airway pressure ("CPAP") machine with a range of five to 20 centimeters per night. *Id.* He stated Plaintiff should not drive a bus until she was able to use her nasal CPAP machine reliably. *Id.* He also instructed her to follow a low sodium, low cholesterol, weight loss diet. *Id.*

Plaintiff presented to Doctors Care with complaints of dizziness, lightheadedness, fatigue, and pain in her left hip and legs on July 24, 2016. Tr. at 424. Curtis Franke, M.D. ("Dr. Franke"), recorded normal findings on

exam, aside from elevated blood pressure at 140/84 mmHg. Tr. at 425. Lab studies and an electrocardiogram ("EKG") were normal. Tr. at 425–26. Dr. Franke provided a short-term prescription for Norco for hip and leg pain and instructed Plaintiff to stay hydrated and out of the heat. Tr. at 426.

On August 24, 2016, Plaintiff endorsed sleeping with the CPAP machine nightly and having improved symptoms. Tr. at 369. She reported a recent episode of chest tightness and questioned whether it might be related to OSA. *Id.* Dr. Ball noted that Plaintiff's weight had decreased to 198 pounds and that she was using her CPAP an average of seven hours and 30 minutes each night. Tr. at 371. He recorded normal findings on physical exam. Tr. at 371–73. He encouraged Plaintiff to follow a weight-reduction and high fiber diet and to return in six months. Tr. at 373.

On September 9, 2016, Dr. Teachman assessed right shoulder pain and prescribed Prednisone 10 mg. Tr. at 410. He noted Plaintiff had been diagnosed with the flu in the emergency room ("ER") and prescribed Albuterol. *Id.*

On September 30, 2016, Dr. Anderson noted that Plaintiff had lost 17 pounds since her last visit. Tr. at 376. Plaintiff continued to endorse significant daytime fatigue, noting that she felt okay upon waking, but developed a tired feeling by noon that persisted throughout the remainder of the day. *Id.* She endorsed widespread myalgias, generalized achiness, and

intermittent muscle pain diffusely and in her legs, but denied joint swelling. *Id.* Dr. Anderson noted normal findings on physical exam, aside from paraspinous tenderness in the lumbar and cervical spine and positive trigger points in the trapezius, rhomboid, arms, and legs. Tr. at 377–78. She assessed fibromyalgia characterized by widespread myalgias without any synovitis on exam and normal/negative laboratory evaluation. Tr. at 378. She increased Gabapentin from 300 to 600 mg at bedtime and refilled Mobic. *Id.* She also assessed fatigue, insomnia, OSA, and PLMD and instructed Plaintiff to follow up with her primary care provider as to dizziness, headaches, palpitations, and depressive symptoms. *Id.*

Plaintiff complained of swelling and pain in her neck, pain in her lower back, frequent and urgent urination, and foul-smelling odor on November 29, 2016. Tr. at 406. Dr. Teachman recorded normal findings on exam, aside from tenderness to palpation ("TTP") in the bilateral lower back and elevated blood pressure at 134/80 mmHg. Tr. at 407. He assessed elevated blood pressure, chronic fatigue, and dysuria and prescribed Hydrocodone-Acetaminophen 7.5-325 mg. Tr. at 407–08.

Plaintiff presented to Doctors Care with a complaint of back pain on January 15, 2017. Tr. at 427. She indicated she had experienced pain in her back and left side after having fallen out of bed one week prior. *Id.* James Lipke, M.D. ("Dr. Lipke"), recorded normal findings on exam. Tr. at 428. He

assessed mid-back pain, prescribed Flexeril and Naprosyn, and instructed Plaintiff to apply ice and heat and to follow up with her primary care physician for a PT referral within the week. *Id.*

On February 24, 2017, Plaintiff endorsed sleeping with her CPAP each night and experiencing improved sleep as a result. Tr. at 441. However, she complained of feeling sleepy after waking and having persistent dizziness. *Id.* She said she was not working because her dizziness affected her ability to perform her job as a bus driver. *Id.* Dr. Ball prescribed Nuvigil 150 mg and instructed Plaintiff to take it for a week prior to returning to work. Tr. at 445. He indicated Plaintiff should be restricted to driving from 7:00 AM to 3:00 PM and should not alter the schedule, as she was more likely to become sleepy on other shifts. *Id.*

On April 5, 2017, x-rays of Plaintiff's lumbar spine showed mild facet hypertrophy at L5–S1. Tr. at 447. X-rays of her right knee indicated mild medial compartment narrowing. Tr. at 448.

Plaintiff followed up with Dr. Teachman for medication refills on April 10, 2017. Tr. at 508. She endorsed back and neck pain and dysuria. *Id.* Dr. Teachman recorded normal findings on exam, aside from TTP of the bilateral lower back. Tr. at 509. He changed Hydrocodone-Acetaminophen 7.5-325 from three times a day to every six hours and replaced Meloxicam with Celebrex 200 mg. *Id.*

Plaintiff presented to Thaddeus J. Bell, M.D. ("Dr. Bell"), for a consultative exam on April 12, 2017. Tr. at 451–53. Dr. Bell noted Plaintiff was overweight at 5'2" tall and 204 pounds with a BMI of 39. Tr. at 451. He described Plaintiff as using no assistive device, having normal gait, not appearing depressed, and being oriented times three. Tr. at 451–52. He stated Plaintiff had no lower extremity edema, no pain to the muscles of the upper or lower extremities, no tenderness in any joints, and full ROM of her back. Tr. at 452. He indicated Plaintiff's smoking was detrimental to her OSA. Tr. at 453. He felt that Plaintiff could handle her funds. *Id.*

On April 17, 2017, state agency psychological consultant Jennifer Steadham, Ph.D. ("Dr. Steadham"), reviewed the record, considered Listing 12.06 for anxiety and obsessive-compulsive disorders, and assessed no impairment in the four functional areas. Tr. at 58–59, 70–71. On the same day, state agency medical consultant Mary Lang, M.D. ("Dr. Lang"), evaluated the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. Tr. at 60–62, 72–74.

Plaintiff complained of headaches, palpitations, daytime fatigue, and increased pain in her right shoulder, bilateral hips, bilateral knees, and

bilateral elbows on May 1, 2017. Tr. at 457. Dr. Anderson noted Plaintiff's weight had increased by 13.2 pounds to 207.2 pounds. Tr. at 458. She recorded paraspinous tenderness in the cervical and lumbar spines and trigger points at the trapezius, rhomboid, arms, and legs. *Id.* She suggested Plaintiff's symptoms were likely caused by fibromyalgia, OSA, and PLMD. Tr. at 458–59. She ordered lab studies and instructed Plaintiff to return in a couple of weeks to review the results. Tr. at 459.

Plaintiff complained of worsening and incapacitating fatigue on May 8, 2017. Tr. at 462. She described episodes that occurred upon waking, in the morning, and in the afternoon. *Id.* She indicated Nuvigil was effective for a day, but then kept her up at night and worsened her symptoms. *Id.* Her blood pressure was elevated at 144/76 mmHg, and her weight had increased to 210 pounds. Tr. at 464. Dr. Ball instructed Plaintiff to discontinue Nuvigil and to begin taking Modafinil 200 mg each morning. Tr. at 465.

Plaintiff complained of right shoulder and knee pain and sought a referral to a rheumatologist on May 11, 2017. Tr. at 505. Dr. Teachman recorded normal findings on exam, aside from TTP of the bilateral lower back. Tr. at 506. He refilled Hydrocodone-Acetaminophen and referred Plaintiff to a rheumatologist for arthralgia and a gastroenterologist for bowel habit changes. *Id.*

Plaintiff complained of chest pain upon breathing and numbness, tingling, and swelling in her legs on June 8, 2017. Tr. at 501. Dr. Teachman noted TTP in the bilateral lower back, but recorded otherwise normal exam findings. Tr. at 502. He refilled Hydrocodone-Acetaminophen and Prilosec and instructed Plaintiff to go to the ER for cardiac enzyme studies based on abnormal findings on an EKG. *Id.*

Plaintiff subsequently presented to the ER at Bon Secours St. Francis Hospital ("BSSFH"). Tr at 893. Cardiac enzyme testing was normal. Tr. at 1179. An EKG showed non-specific T-wave inversion in lead 3, but no other significant sinus tachycardia or T-wave changes. Tr. at 897. A chest x-ray showed no active disease. Tr. at 912. Steven A. Feingold, M.D. ("Dr. Feingold"), assessed non-specific chest pain and instructed Plaintiff to take baby aspirin and Prilosec. Tr. at 897.

Plaintiff presented to Carlysle Barfield, M.D. ("Dr. Barfield"), on June 20, 2017. Tr. at 574. She reported generalized pain that had lasted for over a year and easy fatigability as each day progressed. *Id.* Dr. Barfield noted tenderness "virtually everywhere she was palpated over her torso and extremities." *Id.* He observed questionable swelling of the bilateral wrists and definite swelling of the bilateral second metacarpophalangeal ("MCP") joints. *Id.* He stated Plaintiff had fibromyalgia and probable rheumatoid arthritis ("RA"). *Id.* He prescribed Prednisone 10 mg twice a day to be followed by 5 mg

daily and instructed Plaintiff to continue Celebrex and to follow up in a month. *Id.*

Plaintiff presented to Lars H. Runquist, M.D. ("Dr. Runquist"), for an initial cardiac evaluation on June 22, 2017. Tr. at 588. She endorsed chest pain, palpitations, and tachycardia. *Id.* Dr. Runquist recorded normal findings on exam. Tr. at 589. He assessed rapid palpitations, anterior chest wall pain, and abnormal EKG and ordered a two-week event monitor and an adenosine nuclear stress test. *Id.*

Plaintiff presented for cardiology follow up on July 20, 2017. Tr. at 584. She endorsed some episodes of palpitations and occasional dizziness, but no episodes of syncope. *Id.* Kelly S. Guerrero, PA-C ("PA Guerrero"), noted a nuclear stress test was normal and a two-week event monitor recorded no events. *Id.* She recorded normal findings on exam. Tr. at 586. She assessed shortness of breath on exertion, episodic palpitations, fatigue, and dizziness. *Id.* She suspected Plaintiff's symptoms were non-cardiac, but scheduled an echocardiogram ("echo"), given her history of heart murmur as a child. *Id.* She strongly encouraged Plaintiff to quit smoking, engage in daily exercise, and follow a low fat and heart healthy diet. Tr. at 587.

Plaintiff presented with hyperlipidemia and depression on August 10, 2017. Tr. at 618. She endorsed depressed mood, difficulty concentrating, difficulty falling and staying asleep, diminished interest or pleasure,

excessive worry, fatigue, feelings of guilt, loss of appetite, and restlessness. *Id.* Richetta Deas, ANP ("NP Deas"), noted 1+ pitting edema in Plaintiff's bilateral lower extremities. Tr. at 620. She assessed arthritis pain, hyperlipidemia, RA flare, fibromyalgia, abnormal EKG, OSA, severe single current episode of major depressive disorder ("MDD"), and lower extremity edema. Tr. at 620–21. She encouraged Plaintiff to engage in regular exercise and follow a healthy diet. Tr. at 620. She prescribed Cymbalta 20 mg for MDD and instructed Plaintiff to use compression socks during the day and to elevate her lower extremities as much as possible to address lower extremity edema. Tr. at 621.

Plaintiff followed up with NP Deas on September 7, 2017. Tr. at 627. She reported pain in her hips, ankles, knees, and right shoulder and indicated she felt down, depressed, or hopeless and had little interest or pleasure in doing things. Tr. at 628–29. She weighed 214.8 pounds and had a BMI of 39.29. Tr. at 629. NP Deas observed Plaintiff to be sad and tearful at times. *Id.* She referred Plaintiff to a psychiatrist and refilled Ativan for anxiety. Tr. at 630.

On September 27, 2017, state agency medical consultant James M. Lewis, M.D. ("Dr. Lewis"), reviewed the evidence and provided the following physical RFC assessment: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-

hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Tr. at 94–96, 114–16.

Plaintiff endorsed some improvement on October 6, 2017, but indicated the pharmacy had not provided enough Prednisone. Tr. at 632. She endorsed joint pain. Tr. at 633. NP Deas recorded normal findings on physical exam. Tr. at 634. She refilled Prednisone pending Plaintiff's follow up with Dr. Barfield. *Id.*

On October 25, 2017, Plaintiff presented to Mark McClain, Ph.D. ("Dr. McClain"), for a consultative psychological evaluation. Tr. at 615–17. Dr. McClain noted Plaintiff drove herself to the appointment and served as the sole informant. Tr. at 615. He stated Plaintiff accurately followed a three-step direction, moved very slowly, and had somewhat unstable gait. *Id.* Plaintiff endorsed abilities to care for her personal needs, independently perform activities of daily living ("ADLs"), read, engage in written expression, and manage her finances. *Id.* Dr. McClain observed Plaintiff to be appropriately dressed and well-groomed; have normal motor activity; exhibit good attention; demonstrate average communication skills; and have restricted affect and dysphoric mood. *Id.* Plaintiff reported a lack of motivation due to depressive symptoms, increased anxiety in social situations, excessive worry, ruminative thoughts, withdrawal, loss of interest, fatigue, and feelings of

hopelessness and helplessness. Tr. at 616. She endorsed panic attacks. *Id.* Dr. McClain considered Plaintiff's thought processes to be logical, coherent, and organized. *Id.* He stated Plaintiff was able to repeat three words correctly both immediately and after a five-minute delay. *Id.* He noted Plaintiff performed serial sevens to five operations and correctly repeated five digits in forward order and four in backward order. *Id.* He stated Plaintiff scored 30 of 30 points on the Mini-Mental State Exam ("MMSE"), which suggested she had no cognitive impairment. *Id.* Dr. McClain assessed persistent depressive disorder, generalized anxiety disorder, and panic disorder. *Id.* He felt that Plaintiff's mental health issues were "not predicted to significantly impact her ability to perform simple unskilled work-related tasks." Tr. at 617. He further wrote:

> Regarding her ability to concentrate and perform simple tasks at a reasonable pace, [Plaintiff] is reporting pain issues and stated that she needs to take frequent breaks which may take her longer to complete tasks. Her mental health issues are not predicted to significantly impact her ability to perform simple tasks at a reasonable pace.

*Id.* He also felt that Plaintiff could focus on more complex tasks in a work setting. *Id.*

Plaintiff followed up with Dr. Ball on December 5, 2017. Tr. at 1229. She complained of persistent daytime somnolence with episodes of extreme fatigue that were followed by dizziness. *Id.* She stated she could not "will herself to get up" because she felt so fatigued. *Id.* She also endorsed

17

intermittent numbness of her hands and feet, swelling, memory loss, intermittent fevers, mild cough, shortness of breath, wheezing, chest pain, palpitations, and anxiety. *Id.* Dr. Ball indicated Plaintiff would be scheduled for CPAP titration and a multiple sleep latency test ("MSLT").[3] Tr. at 1231. He noted he had completed part of a disability form based on Plaintiff's OSA symptoms and that Dr. Barfield should complete the rest. *Id.* He recommended a healthy diet and regular exercise. *Id.*

A second state agency psychological consultant, Derek O'Brien, assessed Plaintiff's mental impairment as non-severe on December 8, 2017. Tr. at 91–92, 111–12.

On January 16, 2018, Plaintiff complained that Cymbalta caused her to have headaches. Tr. at 636. Psychiatrist Harish Mangipudi, D.O. ("Dr. Mangipudi"), assessed depression with anxiety, discontinued Cymbalta, and prescribed Elavil 25 mg. *Id.*

Plaintiff complained of dizziness, urinary problems, and pain in her ankles, left hip, toes, wrists, and fingers on January 18, 2018. Tr. at 637. She also endorsed fatigue and sleep disturbance. *Id.* She requested screening for diabetes. *Id.* NP Deas observed Plaintiff to be ill-appearing, somnolent, and

---

[3] "An MSLT is a full-day test consisting of five scheduled naps that test for excessive daytime sleepiness related to narcolepsy or hyposomnia." *Monroe v. Colvin*, 826 F.3d 176, 182 n.6 (4th Cir. 2016) (citing *Sleep Education, Multiple Sleep Latency Test (MSLT)—Overview and Facts*, http://www.sleepeducation.org/disease-detection/multiple-sleep-latency-test/overview-and-facts).

fatigued. Tr. at 639. She assessed diabetes mellitus, referred Plaintiff to a diabetes educator, ordered lab studies, administered insulin, instructed her to maintain a blood sugar log, and prescribed Metformin 500 mg twice a day. Tr. at 637–38. She ordered urinalysis and advised Plaintiff to increase her water intake. Tr. at 637. She also encouraged Plaintiff to follow up with her rheumatologist and prescribed Celebrex 200 mg and Prednisone 1 mg. *Id.*

Plaintiff presented to the ER at BSSFH on January 19, 2018. Tr. at 842. She reported her blood sugar had increased from 270 mg/dL upon waking to 383 mg/dL. *Id.* Kelli M. Young, D.O., explained to Plaintiff how Metformin worked and ordered a liter of intravenous fluids to reduce her sugar. Tr. at 845. She indicated that Plaintiff was scheduled to follow up with her physician the following week to determine whether her dose of Metformin was adequate. *Id.*

Plaintiff complained of depression, anxiety, and chronic pain on January 30, 2018. Tr. at 640. Lorie Jolly, LMSW-CP ("SW Jolly"), noted tearful, flat, and depressed mood/affect. *Id.* Plaintiff described numerous health concerns and feeling depressed because of her inability to have a more active lifestyle. Tr. at 641. SW Jolly encouraged Plaintiff to take her medication as prescribed. *Id.*

Plaintiff underwent a diabetes management visit on January 31, 2018. Tr. at 642–43. Her goals included reducing her hemoglobin A1C to less than

7% and her fasting glucose to less than 130 mg/dL, titrating Metformin from 500 to 1000 mg twice a day, and undergoing regular foot exams. Tr. at 642. Plaintiff expressed willingness to make dietary changes. Tr. at 643. James Sterrett, Pharm. D. ("Dr. Sterrett"), recommended, and NP Deas agreed, to add Duloxetine 20 mg to treat Plaintiff's depression, anxiety, and fibromyalgia. *Id.* Dr. Sterrett did not recommend exercise at the time given Plaintiff's complex pain history and comorbid conditions. *Id.*

Plaintiff reported chronic pain and continued to endorse symptoms of depression and anxiety on February 13, 2018. Tr. at 644. She indicated she was taking her psychiatric medication as prescribed and felt that her symptoms were well-managed. *Id.* SW Jolly worked with Plaintiff to examine her unhealthy thought patterns, and Plaintiff agreed to focus on self-care. *Id.*

Plaintiff reported nightmares related to prior trauma on February 27, 2018. Tr. at 645. SW Jolly noted Plaintiff had a tearful mood/affect. *Id.* Plaintiff reported her medication was helpful and she was taking it as prescribed. Tr. at 646. She endorsed good and bad days, but felt she was "more in control of her emotions." *Id.*

On March 5, 2018, Plaintiff reported body pain and hypoglycemic events in the mornings. Tr. at 647. She indicated she was not taking Amitriptyline or Duloxetine. *Id.* A depression screen was consistent with

severe depression. *Id.* Plaintiff rated her pain as a 10. Tr. at 648. NP Deas ordered lab studies. *Id.*

SW Jolly noted normal mental status findings, including euthymic mood on March 14, 2018. Tr. at 649.

On March 28, 2018, SW Jolly noted Plaintiff's mood was depressed. Tr. at 651. Plaintiff endorsed difficulty with familial relationships. Tr. at 651–52. She agreed to continue to take her medications as prescribed. Tr. at 652.

Plaintiff underwent a maintenance of wakefulness test ("MWT")[4] on April 24, 2018. Tr. at 833–36. She had sleep latency at 40 minutes with three naps and 38 minutes with one nap. Tr. at 833. Dr. Ball diagnosed pathologic sleepiness. Tr. at 835.

---

[4] The test protocol provides:

> The MWT is used to assess a patient's ability to maintain wakefulness under conditions of low stimulation. The study is performed after completion of a preceding full PSG study. The patient sits comfortably in a room that is quiet, secure, at a comfortable temperature and has a low constant level of light that allows the patient to see, but is not overly stimulating. The montage includes central and occipital electroencephalogram, chin muscle activity, and eye movements. A total of four or five nap periods are recorded at two-hour intervals beginning 1.5 to 3 hours after awakening from an all night study (first nap usually at 10:00AM). Each nap is terminated after three epochs of sleep if the patient falls asleep or after 40 minutes if no sleep occurs. A Sleep Latency of 40 minutes indicates no sleep occurred during the nap(s). Normal sleep latency value is 32.6 minutes +/- 9.9 minutes.

Tr. at 833.

Plaintiff complained of increased anxiety and panic attacks on April 18, 2018. Tr. at 653. Her mood and affect were anxious and tearful, but SW Jolly noted she did not present with acute distress. Tr. at 654. SW Jolly recommended Plaintiff follow up with Dr. Mangipudi. *Id.*

Plaintiff again reported anxiety and panic attacks on May 2, 2018. Tr. at 655. SW Jolly noted normal mental status findings, including "euthymic, cheerful" mood and affect. Tr. at 656. Plaintiff complained that her current medication was ineffective at addressing anxiety, and SW Jolly encouraged her to follow up with Dr. Mangipudi for a medication reevaluation. *Id.*

Plaintiff followed up with Dr. Mangipudi on May 11, 2018. Tr. at 657. She complained that Elavil caused headaches and expressed concern with potential cardiac side effects from Cymbalta. *Id.* Dr. Mangipudi stated Plaintiff did not have objective criteria requiring need for antidepressants. *Id.* He emphasized a need for cognitive behavioral therapy ("CBT"), discontinued Elavil, and prescribed Ativan to 1 mg once a day as needed for anxiety. Tr. at 657–58.

Plaintiff presented for A1C follow up and complained of throat pain and neck swelling on June 5, 2018. Tr. at 661. Her hemoglobin A1C had dropped to 6.3% and a diabetic eye exam showed no retinopathy. *Id.* NP Deas ordered a thyroid ultrasound and lab studies, stopped Celebrex and Naprosyn, and

prescribed Bactrim DS, Prednisone, Beconase, Allegra, Omeprazole, and Arthrotec. Tr. at 661–63.

Plaintiff followed up with Dr. Ball to discuss MWT results on June 20, 2018. Tr. at 1232. She reported dizzy spells that occurred once a day, feeling sleepy in the middle of the day, and taking daily naps. *Id.* She indicated she was using her CPAP machine daily, but questioned its functioning, as she had to turn the hose upside down to get air out. *Id.* She endorsed occasional dyspnea on exertion and feeling as if she might pass out when she laughed. *Id.* Dr. Ball stated the MWT showed Plaintiff to be pathologically sleepy with a sleep latency of eight minutes. Tr. at 1233–34. He noted Plaintiff was ambulating with a cane, had an unchanged heart murmur, and had non-pitting edema in her extremities. *Id.* He ordered an MSLT and recommended daily walking exercise and diet. *Id.*

Plaintiff presented to the ER at BSSFH on June 26, 2018, for upper abdominal pain and unresolved pain related to an RA flare-up. Tr. at 795. David Thomas Cook, M.D., noted mild, bilateral upper quadrant tenderness and mild, diffuse lumbar tenderness. Tr. at 796. He suspected cystitis and prescribed Bentyl 20 mg, Pyridium 200 mg, and Macrobid 100 mg. Tr. at 797–98.

Plaintiff underwent overnight PSG and CPAP titration on June 27, 2018. Tr. at 784–89. She did not demonstrate significant oxygen desaturations or periodic limb movements. Tr. at 788.

Plaintiff underwent an MSLT[5] on June 28, 2018. Tr. at 778. Her first nap occurred at 8:04 AM with sleep latency of 4.0 minutes and random eye movement ("REM") latency of 6.5 minutes. *Id.* Her second nap took place at 9:52 AM with sleep latency of 5.5 minutes and no REM latency. *Id.* Her third nap took place at 11:30 AM with sleep latency of 11.0 minutes and no REM latency. *Id.* Her fourth nap was at 1:18 PM with sleep latency of 11.5 minutes and no REM latency. *Id.* Her fifth nap occurred at 3:08 PM with sleep latency of 8.0 minutes and no REM latency. *Id.* Plaintiff slept for a total of 54.5 minutes and had 47% sleep efficiency. *Id.* Dr. Ball noted Plaintiff "appear[ed] to have pathologic sleepiness, evidenced by a short mean sleep latency (8 minutes or less) on this MSLT." Tr. at 780. He noted that weight loss might lead to improvement and recommended caution with driving and during other activities that required alertness for safety. *Id.*

---

[5] The MSLT report provides:

> Patients are monitored throughout four or five 20-minute opportunities to sleep (naps) at two-hour intervals. For each nap, the patient is allowed 20 minutes to fall asleep. Once asleep, the patient is awakened after 15 minutes. Between naps, the patient is kept as alert as possible. A sleep latency of 20 minutes indicates that no sleep occurred.

Tr. at 778.

Plaintiff returned to the ER at BSSFH with complaints of high blood glucose level, frequent urination, and weakness on July 2, 2018. Tr. at 727. Her random glucose was only slightly elevated at 12 mg/dL. Tr. at 730. Justin Aaron Norris, M.D., assessed urinary frequency and discharged Plaintiff. Tr. at 731.

On July 11, 2018, Plaintiff reported symptoms of depression, relationship difficulties, chronic pain, and struggling to manage her glucose level. Tr. at 667. SW Jolly noted depressed and anxious mood and affect. *Id.* She encouraged continued medication adherence, self-care, and follow up for CBT. *Id.*

Plaintiff followed up with Dr. Ball to discuss the results of the most recent sleep study and the MSLT on July 16, 2018. Tr. at 1235. She complained of severe hypersomnolence with worsening fatigue, non-restorative sleep, insomnia, and seasonal allergies. *Id.* Dr. Ball noted the MSLT confirmed narcolepsy.[6] *Id.* He observed Plaintiff to be obese and to ambulate with a cane. Tr. at 1236. He diagnosed narcolepsy without cataplexy,[7] OSA, and other obesity due to excess calories. Tr. at 1237. He

---

[6] "*Dorland's Illustrated Medical Dictionary* defines 'narcolepsy' as 'recurrent, uncontrollable, brief episodes of sleep, often associated with hypnagogic hallucinations, cataplexy, and sleep paralysis.'" *Monroe*, 826 F.3d at 180 n.3 (citing *Dorland's* at 1098).

[7] "*Dorland's Illustrated Medical Dictionary* defines 'cataplexy' as 'a condition in which there are abrupt attacks of muscular weakness and hypotonia triggered by an emotional stimulus such as mirth, anger, fear, or surprise'

prescribed Provigil, instructed Plaintiff to use the nasal CPAP, and recommended daily ambulation exercise and a high fiber, diabetic diet. *Id.*

Plaintiff presented to otolaryngologist Mark J. Hoy, M.D. ("Dr. Hoy"), for evaluation of chronic sore throat, tonsillitis, and enlarged thyroid on August 29, 2018. Tr. at 936. Dr. Hoy performed flexible laryngoscopy that showed a grossly normal endolarynx. Tr. at 937. He noted diffuse enlargement of the thyroid with no definite nodules or masses. *Id.* He assessed chronic sore throat, chronic tonsillitis with hypertrophy and stone formation, referred ear pain due to tonsillitis, possible enlarged thyroid, and history of gastroesophageal reflux disease ("GERD"). Tr. at 939. He recommended a thyroid ultrasound and indicated tonsillectomy was an option, but might not be the best option given Plaintiff's comorbidities. Tr. at 940.

On August 30, 2018, Plaintiff followed up with Dr. Deas to discuss use of Celebrex. Tr. at 669. She reported taking 200 mg of Celebrex daily and indicated she had run out of the medication. *Id.* She stated 100 mg was ineffective. *Id.* NP Deas assessed RA of the bilateral hands, diabetes with diabetic neuropathy, and enlarged thyroid and increased Celebrex to 200 mg daily. *Id.* She referred Plaintiff for a thyroid ultrasound. *Id.*

---

and notes that '[i]t is often associated with narcolepsy.'" *Monroe*, 826 F.3d at 182 n.3 (citing *Dorland's* at 282).

Plaintiff presented to rheumatologist James C. Oates, M.D. ("Dr. Oates"), as a new patient on August 30, 2018. Tr. at 941. She reported having been diagnosed with RA by Dr. Barfield in June 2017 and having started Prednisone with improvement in hand swelling and pain. *Id.* She reported increased morning stiffness lasting two to three hours and joint pain in her lower back, ankles, hips, knees, left shoulder, and fingers. *Id.* She also endorsed bruising, lower extremity rashes, fevers, chills, dry mouth, weight fluctuation, and fatigue. Tr. at 941, 943. She complained of a lump on the right side of her neck. Tr. at 941. Dr. Oates noted bilateral tonsillitis with white plaque and TTP of the neck and left shoulder. Tr. at 944. X-rays of Plaintiff's hands were negative and showed no signs of arthritis or erosions. Tr. at 946. X-rays of her knees and feet were also negative, except that the x-rays of her feet showed bilateral hallux valgus. Tr. at 947. Dr. Oates noted lab studies were negative for rheumatoid factor and other abnormalities, but it was possible that Plaintiff had seronegative RA, given her symptoms. *Id.* Plaintiff agreed to proceed with disease-modifying antirheumatic drug ("DMARD") therapy, and Dr. Oates prescribed Sulfasalazine 500 mg twice a day. *Id.* Dr. Oates noted that her low vitamin D level might be contributing to Plaintiff's arthralgia and prescribed a vitamin D supplement. *Id.* He encouraged Plaintiff to follow up with the ear, nose, and throat specialist for chronic tonsillitis and hoarseness. *Id.*

Plaintiff presented to Dr. Ball on September 4, 2018, and requested that he complete paperwork that pertained to a student loan. Tr. at 1238. She reported beneficial use of CPAP and indicated she was no longer waking herself from snoring. *Id.* She reported mood swings, other side effects, and waking up sleepy while using Nuvigil. *Id.* She indicated she took naps during the day. *Id.* Dr. Ball noted Plaintiff was obese and ambulated with a walker, but recorded otherwise normal findings on exam. *Id.* He stated: "She cannot take modafinil or Nuvigil so she is very sleepy during the day in spite of being compliant with the CPAP machine." Tr. at 1239. He completed paperwork for Plaintiff's student loan. *Id.*

Plaintiff presented to the ER at BSSFH with pain in her rib and chest wall on September 22, 2018. Tr. at 691. Kevin Charles Price, M.D. ("Dr. Price"), noted tenderness to the right anterior chest wall with no definite palpable crepitus or click. Tr. at 692. X-rays of Plaintiff's chest showed no evidence of acute intrathoracic disease. Tr. at 690. Dr. Price discharged Plaintiff with a diagnosis of chest wall and rib pain and prescriptions for Ultram, Naprosyn, and Flexeril. Tr. at 693–94.

On September 27, 2018, Plaintiff complained of a knot on the side of her neck and requested that Dr. Ball complete long-term disability paperwork. Tr. at 1241. She indicated she did not want to get out of her bed, despite having had a good night's sleep. *Id.* Dr. Ball documented normal

findings on exam, aside from obesity. Tr. at 1242. He stated he planned "to fill out her forms so that she can get her disability since she cannot work." Tr. at 1243. He further noted "[s]he cannot stay awake." *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

At the hearing on December 6, 2018, Plaintiff testified she was taken out of work on December 5, 2016, based on a diagnosis of OSA. Tr. at 38. She said she had "spells" while driving, after which she could not remember anything. Tr. at 39. She stated she had "bad dizzy spells" and an incident while working during which she nearly crashed on the Ravenel Bridge while "trying to get over from falling asleep behind the wheel." *Id.* She indicated she had radioed her dispatcher while experiencing the episode, and her dispatcher had instructed her to slow down, turn on her hazard lights, and proceed across the bridge, as there was nowhere to pull over. *Id.* She said she had been nervous and shaking because she feared she would crash. *Id.* She testified she felt fine when she started her shift at 5:15 that morning, but subsequently felt drowsy. Tr. at 40. She described taking a break to walk around for about 15 minutes during an extended stop. *Id.* She said she resumed driving and, after about eight minutes, she could not keep her eyes open. *Id.*

Plaintiff testified that she continued to experience similar incidents after the one that led to her removal from work. *Id.* She indicated she had already been using a CPAP machine. Tr. at 40–41. She stated her doctor initially prescribed Nuvigil for narcolepsy, but it stopped working after three days and caused her to experience dizziness and sustain falls. Tr. at 41. She said Dr. Ball subsequently prescribed Provigil, but she discontinued it because it worsened her symptoms and caused extreme mood swings and major headaches. Tr. at 41–42. She stated there were no other treatments available at the time. Tr. at 42.

Plaintiff testified she felt dizzy several times a day and took at least two naps that lasted for two to six hours at a time. *Id.* She said she slept well, except when she experienced hallucinations. Tr. at 43. She indicated her doctor had instructed her not to drive or stand for long periods because of dizziness and falls. *Id.* She said she used a cane for balance based on her doctor's recommendation. Tr. at 44.

Plaintiff testified that narcolepsy and OSA were the conditions that prevented her from working. *Id.* She stated her doctor advised her to use the CPAP for "at least four hours a night," but she used it for the entire night and sometimes when she napped during the day. Tr. at 45. She said she used a microwave to prepare food. *Id.* She noted she lived with her fiancé, who was

unable to assist her because he was on dialysis. Tr. at 46. She said her mother sometimes helped her. *Id.*

In response to the ALJ's questioning, Plaintiff admitted she continued to drive to areas a few blocks from her home. *Id.* She indicated she always had someone with her when she drove. Tr. at 47. She stated she was diagnosed with narcolepsy in April of that year. *Id.* She described extreme drowsiness within two hours of waking that required she sit down and that lasted for three to five hours. Tr. at 49. She said she would take a nap and experience the same feelings again. *Id.* She stated it was not as bad on some days and worse on others. Tr. at 50. She described increased symptoms that had occurred a couple of weeks prior and said her symptoms had improved after her doctor adjusted her CPAP settings. *Id.* The ALJ asked Plaintiff if she would fall asleep during conversations. Tr. at 50–51. Plaintiff denied that she would fall asleep and said she would hear the person talking, but would daydream and not comprehend what was said. Tr. at 51. She stated it was like her "mind just clocks out for a minute or something." *Id.*

2.    The ALJ's Findings

In his decision dated June 4, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    Claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.   Claimant has not engaged in substantial gainful activity since December 5, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   Claimant has the following severe impairments: sleep apnea, fibromyalgia, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.   Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with some non-exertional limitations. Specifically, claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. She can stand, walk, and sit for 6 hours each in an 8-hour day. She occasionally can crawl and climb ladders. She frequently can balance, stoop, kneel, crouch, and climb ramps and stairs.

6.   Claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   Claimant was born on April 11, 1978 and was 37 years old, which is defined as a younger individual age 18–49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569, 416.1569a, 416.969, and 416.969a).

11.  Claimant has not been under a disability, as defined in the Social Security Act, from December 5, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–27.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in assessing narcolepsy as a non-severe impairment; and

2)    the ALJ improperly discounted Plaintiff's treating physician's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting

33

"need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[8] (4) whether such impairment prevents claimant from performing PRW;[9] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at

---

[8] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[9] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the

decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Step Two Finding as to Narcolepsy

Plaintiff argues the ALJ erred in finding that narcolepsy was not a severe impairment. [ECF No. 17 at 7]. She maintains the ALJ ignored the objective test results supporting the diagnosis because she did not actually fall asleep during an office visit with Dr. Ball. *Id.* She contends the ALJ erred in concluding that narcolepsy had not lasted for 12 continuous months, as Dr. Ball had added the diagnosis in July 2018 based on June 2018 testing, her condition was not expected to improve, and the ALJ rendered his decision in June 2019. *Id.* at 8. She claims the limitation to occasional climbing of ladders did not adequately address the effects of her impairment. *Id.* at 8–9.

The Commissioner argues the ALJ properly concluded that narcolepsy was not a severe impairment because it did not significantly limit Plaintiff's mental or physical ability to do basic work activities. [ECF No. 19 at 8]. He maintains the ALJ noted that no treating or consultative provider had observed Plaintiff to appear excessively sleepy, to fall asleep, to have impaired consciousness, or to appear to be responding to internal stimuli. *Id.* at 9–10. He notes that Dr. Ball described Plaintiff as alert during some visits.

*Id.* at 9. He contends that even if the ALJ erred in assessing the severity of narcolepsy, his error was harmless because he progressed to the third step of the evaluation process and considered it in assessing Plaintiff's RFC. *Id.* at 11. He maintains that the record contained no evidence to suggest narcolepsy affected Plaintiff's abilities to concentrate, persist, or maintain pace. *Id.* at 12–13. He claims that, although the ALJ did not specifically restrict Plaintiff to avoidance of hazards or no climbing of ladders, ropes, or scaffolds, any error in failing to do so would be harmless as the RFC assessment would also allow for Plaintiff to perform the full range of sedentary work. *Id.* at 14.

After establishing that a claimant has a medically-determinable impairment, the ALJ should subsequently assess whether the impairment is severe. 20 C.F.R. §§ 404.1521, 416.921. A severe impairment "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment is 'not severe' or insignificant only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Richenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985) (citing *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984); *see also* 20 C.F.R. §§ 404.1522(a), 416.922(a) (stating "[a]n impairment or combination of

impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities").

The ALJ declined to include narcolepsy among Plaintiff's severe impairments at step two. Tr. at 17. He found that narcolepsy "no more than minimally affected claimant's ability to perform work related activity for a period of at least twelve continuous months." Tr. at 18. He wrote the following:

> Claimant told her pulmonologist, James Austin Ball, M.D., in May 2016 that she sometimes awakens without knowing how she arrived at her present location (Exhibit 4F), but she did not regularly make similar complaints to Dr. Ball or other providers. She made reports to Dr. Ball of having daytime fatigue and hyper-somnolence. (Exhibit 15F and 26F), but treatment records do not document subjective reports of such frequent naps or naps of such extended duration as she described at the hearing.
>
> Claimant underwent a maintenance and wakefulness test (MWT) in June 2018 which showed her to be pathologically sleepy with a sleep latency of 8 minutes. (Exhibit 26F/5, 6) She also underwent a multiple sleep latency test (MSLT) in June 2018 which confirmed narcolepsy and showed pathological sleepiness and sleep onset REM. (Exhibits 24F, 93 and 26F/5, 6) Although claimant testified that she experiences weakness in association with her sleep-related symptoms, Dr. Ball diagnosed claimant with narcolepsy without cataplexy in July 2018. (Exhibit 26F/9)
>
> Consistent with claimant's testimony, treatment notes reveal Dr. Ball prescribed claimant Nuvigil, and later changed this medication to Provigil (also known as Modafinil), but both medications were discontinued due to side effects. Dr. Ball has not recommended other medication for narcolepsy, but he did advise claimant to engage in daily ambulatory exercise. (Exhibit 26F)

Despite claimant's diagnosis of narcolepsy, neither Dr. Ball nor any other treating providers observed claimant to appear excessively sleepy, to fall asleep, to have impaired consciousness, or to appear to be responding to internal stimuli, such as hallucinations. Similarly, consultative examiner Thaddeus Bell, M.D., and psychological consultative examiner Mark McClain, Ph.D., did not document such observations. (Exhibits 13F and 20F) Dr. McClain, however, reported claimant to exhibit good attention throughout his evaluation. (Exhibit 20F) Further supporting a conclusion that narcolepsy is not a severe impairment, testing did not establish narcolepsy until the above referenced MWT and MSLT tests performed in June 2018, and Dr. Ball did not document an assessment of narcolepsy until July 2018. Accordingly, the evidence does not establish that narcolepsy has persisted for at least 12 continuous months during the time period at issue.

Tr. at 18–19.

The ALJ misrepresented the evidence, in part. Contrary to his assertion, Plaintiff registered complaints as to narcolepsy-related symptoms to multiple providers throughout the relevant period. In May 2016, Plaintiff complained to Dr. Ball of feeling tired when she woke and exhausted throughout the day and described having driven home from work without knowing how she got home and having awakened in neighborhoods without knowing where she had gone. Tr. at 364. On September 30, 2016, Plaintiff complained to Dr. Anderson of significant daytime fatigue, noting that she felt okay upon waking, but developed a tired feeling by noon that persisted throughout the remainder of the day. Tr. at 376. On February 24, 2017, Plaintiff complained to Dr. Ball of feeling sleepy after waking and having persistent dizziness, despite using her CPAP machine nightly. Tr. at 441.

40

Plaintiff again reported "a lot of daytime fatigue" to Dr. Anderson on May 1, 2017. Tr. at 457. On May 8, 2017, she complained to Dr. Ball of worsening and incapacitating episodes of fatigue that occurred upon waking, in the morning, and in the afternoon, despite use of Nuvigil. Tr. at 462. On June 20, 2017, she reported to Dr. Barfield easy fatigability as each day progressed. Tr. at 574. In December 2017, Plaintiff complained to Dr. Ball of persistent daytime somnolence with episodes of extreme fatigue that were followed by dizziness and stated she could not "will herself to get up." Tr. at 1229. On January 18, 2018, Plaintiff complained of fatigue and sleep disturbance, and NP Deas observed her to be somnolent and fatigued. Tr. at 637, 639. On June 20, 2018, Plaintiff reported to Dr. Ball dizzy spells that occurred once a day, feeling sleepy in the middle of the day, and taking daily naps. Tr. at 1232. On July 16, 2018, she complained to Dr. Ball of severe hypersomnolence with worsening fatigue, non-restorative sleep, and insomnia. Tr. at 1235. She reported to Dr. Ball on September 4, 2018, that she was using a CPAP machine, but continued to take naps during the day. Tr. at 1238. On September 27, 2018, Plaintiff indicated to Dr. Ball that she did not want to get out of her bed despite having had a good night's sleep. Tr. at 1241.

The ALJ further erred in concluding that narcolepsy did not meet the durational requirement. The regulations include a "durational requirement" in 20 C.F.R. § 404.1509 and § 416.909 that states "[u]nless your impairment

41

is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months." The ALJ stated narcolepsy had "not persisted for at least 12 continuous months during the time period at issue." Tr. at 19. To support his conclusion, he cited the MWT results, the MSLT results, and the diagnosis of narcolepsy and claimed that each occurred less than 12 months prior. Tr. at 18. However, his finding is flawed, as he erroneously claimed that the MWT was administered in June 2018, but it was actually administered in April 2018, more than 12 months prior to his decision. *See* Tr. at 833–36. In addition, Plaintiff reported symptoms consistent with a diagnosis of narcolepsy beginning in May 2016 and indicated those symptoms became severe enough to necessitate she stop working on December 5, 2016. Tr. at 38. "The 12 month duration requirement measures the length of the impairment, not the time from the diagnosis." *Exum v. Astrue*, 2012 WL 5363445, at *2 (D. Md. Oct. 26, 2012) (citing 20 C.F.R. § 404.1509). Thus, the ALJ erred to the extent that he ignored evidence of the existence of the impairment prior to the time of diagnosis. Finally, even if Plaintiff's narcolepsy had not "lasted for at least 12 months during the time period at issue," the ALJ recognized evidence that it would be expected to last for at least 12 months, noting that Plaintiff's symptoms had failed to respond to medication, Tr. at 18, but the ALJ did not reconcile that

information with his finding that the impairment did not meet the durational requirement.

The ALJ also drew impermissible inferences from the evidence, focusing on Plaintiff's providers' failure to document sleepiness or lack of alertness to support a conclusion that narcolepsy imposed no functional limitations. *See Anderson v. Berryhill*, C/A No. 6:16-3550-DCC, 2018 WL 1531558, at *3 (D.S.C. Mar. 29, 2018) (providing that the ALJ errs when he attempts to "arrive at some conclusion" about medical evidence or has a "tendency to interpret, rather than weigh, the evidence"); *see also Murphy v. Astrue*, 495 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (providing that, as a lay person, the ALJ is "simply not qualified by interpret raw medical data in functional terms"). The ALJ based his finding of the severity of Plaintiff's narcolepsy on observations he would expect to see in the medical records, without the benefit of any medical authority indicating such signs should be present. It may be that a medical expert would agree with the ALJ's interpretation of the evidence, but the record contains no opinion from a medical expert, and the state agency medical consultants rendered their opinions without the benefit of the MSLT and MWT results. The only opinion interpreting the raw medical data is that of Dr. Ball, which the ALJ rejected.

In the absence of any other explanation from a provider qualified to interpret the medical data, substantial evidence does not support a finding that Plaintiff's providers' observations undermined the results of the MSLT and MWT and Dr. Ball's assessment of the severity of narcolepsy.

Regardless of these errors in evaluating the severity of Plaintiff's impairment, the ALJ's procession beyond step two might have rendered his error harmless. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."); *see also Washington v. Astrue*, 98 F. Supp. 2d 562, 580 (D.S.C. 2010) (providing that the court "agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). Therefore, the undersigned has evaluated whether the ALJ adequately considered narcolepsy in assessing Plaintiff's RFC.

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect

[the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)).

"[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas*, 915 F.3d at 311. The ALJ should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. §§ 404.1545(a), 416.945(a). He must include a narrative discussion that cites "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He must also explain how any material inconsistencies or ambiguities in the record were resolved." SSR 16-3p, 2016 WL 1119029, at *7. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013). In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court provided that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate

meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

A claimant's subjective complaints as to his symptoms are among the non-medical evidence an ALJ is to consider in assessing the RFC. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the claimant's impairments could reasonably produce the symptoms he alleges, the ALJ moves to the second step in which he must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The ALJ must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. He is required to explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." *Id.* at *8.

In addressing narcolepsy, the ALJ wrote:

> While I do not find narcolepsy to be a severe impairment, any limitations it may impose would be accounted for by claimant's assigned residual functional capacity. For example, any reduction in stamina associated with narcolepsy related symptoms would be accounted for by the limitation to the exertional demands of light work. The limitation to occasional climbing of ladders would account for safety concerns associated with narcolepsy. As noted above, however, treating and examining providers have not observed Plaintiff to appear excessively sleepy, to fall asleep, to exhibit impaired consciousness, or to appear to be responding to internal stimuli during appointments, and Dr. Ball specifically noted in July 2018 that claimant does not have cataplexy (Exhibit 26F/8).

Tr. at 19. In explaining the RFC assessment, the ALJ acknowledged Plaintiff's reports to Dr. Ball of daytime sleepiness and fatigue, but dismissed them because "treating and examining providers ha[d] not observed claimant to appear excessively sleepy." Tr. at 23. He wrote the following:

> In limiting claimant to the exertional demands of light work, I have considered her diagnosis of sleep apnea, her complaints of daytime sleepiness and fatigue, her complaints of widespread pain, the above referenced positive findings of tenderness and trigger points supporting the diagnosis of fibromyalgia, and the above referenced measurements relating to claimant's diagnosis of obesity.
>
> Treatment records, however, do not document regular findings of abnormal strength. Treating and examining providers have not observed claimant to appear excessively sleepy, to fall asleep, or to exhibit impaired consciousness. Claimant testified that most of the time, she gets a good night's sleep, and treatment records do not document subjective reports that claimant reported such frequent naps of such extended duration as she described at the hearing. Accordingly, I do not find the evidence supports a conclusion that claimant would require more extensive exertional limitations.

Tr. at 24. He indicated he gave "claimant the benefit of the doubt that obesity, pain, and sleep apnea with associated daytime sleepiness/fatigue would limit claimant to only occasionally climbing ladders and crawling," because the record documented few, if any, findings of abnormal ROM, balance, or gait. Tr. at 25.

The ALJ did not reconcile Plaintiff's statements to her providers and the results of the MSLT and MWT with her providers' observations or lack thereof. The ALJ failed to explain how Plaintiff's ability to appear alert and demonstrate a normal level of consciousness during treatment visits translated into an ability to complete a normal workday and workweek without interruption from symptoms of narcolepsy. *See Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 90 ("To assess the claimant's Residual Functional Capacity, the ALJ must identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work related' activities 'on a regular and continuing basis'—i.e., '8 hour a day, for 5 days a week, or an equivalent work schedule.'" (citing SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

In *Monroe*, 826 F.3d at 188, the court considered a claim involving impairments of narcolepsy and sleep apnea. After noting that the ALJ had expressed the RFC prior to analyzing the claimant's limitations on a function-by-function basis, the court wrote the following:

> The error is most concerning regarding Monroe's alleged episodes of loss of consciousness and fatigue. Monroe testified that he would lose consciousness about two or three times per day and would need to take several breaks during the day because of fatigue. The ALJ indeed found that Monroe had the severe impairments of sleep apnea and narcolepsy, and he concluded that Monroe's impairments could reasonably be expected to cause his claimed symptoms. Nevertheless, he never made specific findings about whether Monroe's apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur.

*Id.* (citing SSR 96-8p, 61 Fed. Reg. at 34,478 ("In all cases in which symptoms, such as pain, are alleged, the RFC assessment must . . . [i]nclude a resolution of any inconsistencies in the evidence as a whole" and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work")).

Unlike the ALJ in *Monroe*, this ALJ did not find narcolepsy to be a severe impairment, but his finding was erroneous for the reasons discussed above. Similar to the ALJ in *Monroe*, this ALJ failed to specifically address whether Plaintiff's narcolepsy would necessitate breaks in work. Although the ALJ "d[id] not find that the evidence support[ed] a conclusion that claimant would require more extensive exertional limitations," Tr. at 24, he did not address whether symptoms of narcolepsy would impose additional non-exertional limitations. He did not reconcile his RFC assessment with objective test results, Plaintiff's statements to multiple providers, and her

treating specialist's opinion indicating that she would be unable to complete a normal workday due to falling asleep.

In light of the foregoing, the ALJ erred in failing to adequately consider functional limitations allegedly imposed by narcolepsy.

2.    Dr. Ball's Opinions

On September 4, 2018, Dr. Ball completed a physician's certification as part of Plaintiff's application for discharge of her student loans based on total and permanent disability. Tr. at 1228. He selected "[y]es" in response to the question "Does the applicant have a medically determinable physical or mental impairment that prevents the applicant from engaging in any substantial gainful activity?" *Id.* He noted Plaintiff's impairment had lasted or was expected to last for a continuous period of at least 60 months. *Id.* He identified Plaintiff's diagnoses as OSA and narcolepsy. *Id.* In response to questions as to limitations on sitting, standing, walking, or lifting and social/behavioral limitations, Dr. Ball wrote "CAN'T STAY AWAKE." *Id.* He noted Plaintiff had no limitations on ADLs, unknown residual functionality, and no problem with psychiatric functioning. *Id.*

On September 27, 2018, Dr. Ball completed a physical ability assessment form in which he identified Plaintiff's diagnoses as OSA and narcolepsy and indicated his assessment was based on observation, examination, functional assessment, and a diagnosis that implied an

increased risk of harm requiring physician-imposed work activity restrictions. Tr. at 1244. He opined that Plaintiff could engage in the following frequently: bilateral fine manipulation, bilateral simple and firm grasping, and lifting 10 pounds. Tr. at 1244–45. He indicated Plaintiff could engage in occasional walking and reaching in all directions. Tr. at 1244. He wrote "FALL ASLEEP" with respect to inquiries as to Plaintiff's sitting and standing abilities. *Id.* He checked "Does Not Apply to Diagnosis" as to inquiries regarding lifting 11 pounds or greater, carrying, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, seeing, hearing, and using the lower extremities for foot controls. Tr. at 1245. He wrote: "SEVERE DAYTIME HYPERSOMNOLENCE AND UNABLE TO DO ANY OF ABOVE RELIABLY." *Id.*

Plaintiff argues the ALJ erred in giving no weight to Dr. Ball's opinions merely because he did not observe her falling asleep in his office. [ECF No. 17 at 10].

The Commissioner claims the ALJ properly discounted Dr. Ball's opinions. [ECF No. 19 at 14]. He maintains the ALJ correctly concluded that the decision as to whether Plaintiff could work was reserved to the Commissioner. *Id.* He contends the ALJ cited a lack of support in Dr. Ball's records and inconsistency of his opinion with the observations of other providers. *Id.* at 15.

Because Plaintiff's application for benefits was filed prior to March 27, 2017, the rules and regulations in 20 C.F.R. § 404.1527 and § 416.927 and SSRs 96-2p, 96-5p, and 06-3p address the relevant factors the ALJ was to consider in evaluating the medical opinions of record. *See* 20 C.F.R. §§ 404.1520c, 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [§ 416.927] apply); 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017"). Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." SSR 96-5p (quoting 20 C.F.R. § 404.1527(a)(2) and § 416.927(a)(2)).

Pursuant to the treating physician rule, if a treating physician's medical opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record, the ALJ is required to accord it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[T]reating physicians are given 'more weight . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone[.]" *Lewis*, 858 F.3d at 867 (quoting 20 C.F.R. § 404.1527(c)(2)).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). However, if the ALJ finds a treating physician's opinion is not well supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence of record, he cannot merely reject the opinion. SSR 96-2p, 1996 WL 374188, at *4. His decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and must be "sufficiently specific to make clear" to the court "the weight [he] gave to the . . . opinion and the reason for that weight." *Id.* at *5. If the ALJ declines to accord controlling weight to the treating source's medical opinion, he must weigh all the medical opinions of record based on the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c), which include: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

The ALJ gave little weight to Dr. Ball's opinion. Tr. at 25. He noted that the determination of disability was reserved to him. *Id.* He further wrote:

> Moreover, the evidence does not document findings supporting an inability to perform substantial gainful activity or Dr. Ball's report in his statement that claimant cannot stay awake. Neither Dr. Ball nor any other treating providers observed claimant to appear to be excessively sleepy, to fall asleep, or to have impaired consciousness. In addition, the evidence does not establish that narcolepsy has persisted for at least 12 continuous months during the time period at issue. Moreover, in July 2018, Dr. Ball indicated that claimant's narcolepsy was without cataplexy.

Tr. at 25.

Although the ALJ correctly concluded that Dr. Ball's indication that Plaintiff's impairments prevented her from engaging in substantial gainful activity was an opinion on an issue reserved to the Commissioner, he erroneously neglected to consider Dr. Ball's judgments as to the effects of narcolepsy and OSA on Plaintiff's ability to complete the physical and mental demands of work. *See* SSR 96-5p. Dr. Ball's opinion that Plaintiff could not stay awake to reliably complete a workday appears to be consistent with medically-acceptable clinical and laboratory diagnostic techniques to the extent that he claimed to have based it on results of the MSLT and MWT showing pathologic sleepiness. Dr. Ball's specialization, his treatment history with Plaintiff, the objective evidence supporting the diagnosis, and the

consistency of Plaintiff's complaints arguably weighed in favor of the opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ concluded Dr. Ball's opinion was inconsistent with the other substantial evidence of record to the extent that neither Dr. Ball nor any of Plaintiff's other providers documented observations of excessive sleepiness or impaired consciousness, the impairment had not lasted for 12 continuous months, and Plaintiff did not have cataplexy. The undersigned has addressed and rejected the ALJ's argument as to the durational requirement and has noted that the ALJ drew impermissible inferences from Plaintiff's providers' observations. The ALJ also failed to explain how Plaintiff's ability to be awake and alert during brief treatment visits undermined Dr. Ball's opinion that she would be unable to remain awake to complete an eight-hour workday. As for his argument regarding cataplexy, while "abrupt attacks of muscular weakness and hypotonia triggered by an emotional stimulus," *Monroe*, 826 F.3d at 182, n.3 (citing *Dorland's* at 282), would theoretically impose additional exertional restrictions, the absence of the symptom does not undermine Dr. Ball's opinion that narcolepsy and OSA would prevent Plaintiff from reliably staying awake to complete a workday.

In light of the foregoing, substantial evidence does not support the ALJ's allocation of little weight to the treating physician's opinion.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 19, 2021                          Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge